IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CAPITAL CONCEPTS, INC.,
*doing business as*
BCREATIVE, INC.,

*Plaintiff*,

v.

THE MOUNTAIN
CORPORATION, ET AL.,

*Defendants*.

CIVIL ACTION NO. 3:11-CV-00036

MEMORANDUM OPINION

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiff Capital Concepts, Inc., doing business as bCreative, Inc. ("bCreative"), filed a complaint stating the following "NATURE OF ACTION":  "This is an action for injunctive relief, compensatory damages, statutory damages, and other appropriate relief arising out of the Defendants' willful infringement of bCreative's copyrights in numerous creative works. bCreative further seeks injunctive relief and damages for Defendants' unauthorized use of [Plaintiff's] unique and proprietary creative materials" that, as counsel for Defendants acknowledged at the hearing on the instant motions, are not "material that could be subject in any way to copyright."

Regarding Count I of the complaint, alleging copyright infringement, Defendants The Mountain Corporation ("The Mountain") and Mountain Retail, LLC ("Mountain Retail") move for summary judgment, contending that, because of alleged errors in Plaintiffs' copyright registrations, Plaintiff does not have a valid copyright that could be infringed.[1]  *See* docket no.

---

[1] Defendants move in the alternative to dismiss for lack of subject matter jurisdiction.  However, a motion to dismiss is untimely under Rule 12(b) of the Federal Rules of Civil Procedure, which requires that "[a]
(continued...)

32.  Regarding the claims in Count II (breach of contract), Count III (breach of contract), Count IV (tortious interference with contract) and Count V (unjust enrichment), Defendants move for summary judgment on the ground that they are preempted by the Copyright Act.  *See* docket no. 30.

As explained herein, Defendants' motions will be denied.  Plaintiff's copyright registrations are valid and it is entitled to a jury trial on its Count I claim for copyright infringement, and the claims in Counts II, III, and IV seek vindication for violations of Plaintiff's legal rights separate and distinct from the copyrights underpinning its claim for copyright infringement.  Such claims are not preempted by the Copyright Act, because those claims concern content that does not fall within the subject matter of copyright protection under the Copyright Act.

## I.

### *A.*

Pursuant to a License Agreement, dated October 1, 2006 (the "License Agreement"), between The Mountain and Plaintiff's licensee, Looking Good Licensing, LLC ("LGL"), Plaintiff provided The Mountain with 32 unique designs for a new line of outdoor-themed t-shirts to be launched by The Mountain known as "Mountain Life" (the "Designs").  In the License Agreement, The Mountain expressly agreed that Plaintiff owns the copyright in the

---

[1](...continued)
motion asserting any of [the Rule 12(b)] defenses must be made before pleading," and Rule 7(a) defines an answer as a pleading.  Defendants filed an answer to the complaint on July 1, 2011, but did not move to dismiss until June 1, 2012.  In any event, Defendants' motion to dismiss fails for the same reasons the motion for summary judgment fails.

Designs and all modifications thereto.  Plaintiff subsequently obtained copyright registrations for 19 of the Designs (or, the "Copyrighted Designs").  Plaintiff and The Mountain were unable to agree upon terms for renewing the License Agreement, and on March 1, 2009, the License Agreement terminated.  The Mountain was then entitled to a three-month inventory sell-off period, which expired on May 31, 2009.  Plaintiff alleges that, since May 31, 2009, The Mountain has continued to sell t-shirts bearing the Designs to retailers across the country, and that the co-defendant in this case, Mountain Retail, a wholly-owned subsidiary of The Mountain, has also sold t-shirts bearing the Designs on its Web-site.

Defendants challenge Plaintiff's ownership of the Copyrighted Designs, arguing that the agreement executed by Rob McAbee ("McAbee"), the graphic designer who created the Copyrighted Designs for Plaintiff (the "McAbee Agreement"), does not transfer ownership of the copyrights therein to Plaintiff.  Defendants argue further that the copyright registrations issued to Plaintiff for the Copyrighted Designs are invalid because the copyright applications incorrectly described the Copyrighted Designs as "works made for hire."

Both arguments fail.

As Plaintiff acknowledges, the Copyrighted Designs created by McAbee are not "works made for hire" under the Copyright Act, 17 U.S.C. § 101, and the McAbee Agreement incorrectly describes these works as "works made for hire."  However, a determination that the Copyrighted Designs are not "works made for hire" does not end the analysis, because under § 204 of the Copyright Act, the McAbee Agreement is a sufficient writing to transfer ownership of the Copyrighted Designs to Plaintiff.  The McAbee Agreement clearly demonstrates the mutual intent between McAbee and Plaintiff that McAbee would transfer ownership of the copyrights in all works that he created for Plaintiff, and McAbee has confirmed such intent in

deposition testimony. As such, Plaintiff's mistaken description of the Copyrighted Designs as "works made for hire" is of no consequence, as it in no way invalidates the legal effect of the McAbee Agreement in transferring ownership of the Copyrighted Designs to Plaintiff. Additionally, McAbee has executed a subsequent Memorandum of Terms confirming his intention and agreement as set forth in the McAbee Agreement to assign and transfer ownership of the Copyrighted Designs to Plaintiff. While not necessary to defeat Defendants' arguments, this Memorandum of Terms satisfies the requirements of § 204(a) of the Copyright Act and puts to rest any factual or legal dispute concerning the validity of the transfer of the Copyrighted Designs from McAbee to Plaintiff. In any event, Defendants have no standing to challenge the validity of the McAbee Agreement, as there is no dispute between McAbee and Plaintiff that, consistent with the parties' intentions, the McAbee Agreement transferred ownership of the Copyrighted Designs to Plaintiff.

I am also unpersuaded by Defendants' contention that they are entitled to summary judgment because Plaintiff's copyright registrations for the Copyrighted Designs are allegedly deficient and thus invalid.

It is well-settled that a mistake or omission in a copyright application does not necessarily render the subsequent registration invalid. To succeed with this argument, Defendants would have to establish that Plaintiff committed fraud on the Copyright Office, but Defendants do not make this allegation – and it would not be credible if they did. At worst, Plaintiff relied upon the language of the McAbee Agreement, which described the Copyrighted Designs as "made for hire," and made a harmless and immaterial mistake on its copyright applications by inaccurately describing the works as "made for hire," rather than basing its claim to ownership on a written agreement. There was a written agreement in place when the copyright registrations were filed;

this written agreement assigned ownership of the Copyrighted Designs to Plaintiff; and there is no dispute that McAbee assigned, and intended to assign, ownership of the Copyrighted Designs to Plaintiff.  Thus, it is clear that Plaintiff did not attempt to trick or deceive the Copyright Office by claiming ownership of the Copyrighted Designs.   Accordingly, Plaintiff's copyright registrations are valid and Plaintiff is entitled to a jury trial on its claim for copyright infringement.

*B.*

The summary judgment record, properly weighed and construed, discloses the following facts.[2]

---

[2] Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to show that such an issue does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, a "court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).  "The evidence of the nonmovant is to be believed," *Anderson*, 477 U.S. at 255, and its "version of any disputed issue of fact . . . is presumed correct," *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992).

> [S]ummary judgment is only proper if there is no dispute as to any material fact or as to the reasonable inferences that can be drawn from the facts.  Where the party challenging the grant of summary judgment can show that the inferences they suggest are reasonable in light of the competing inferences, summary judgment must be denied.

*Columbia Union Coll. v. Clarke*, 159 F.3d 151, 164 (4th Cir. 1998) (internal citations omitted).

"[T]o establish a claim of copyright infringement, a plaintiff must show '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *O'Well Novelty Co., Ltd. v. Offenbacher, Inc.*, 225 F.3d 655 (Table), 2000 WL 1055108 *3 (4th Cir. 2000) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  While a "certificate of copyright registration made before or within five years of the first publication of the work constitutes prima facie evidence of a copyright's validity," *O'Well*, at *3 (citing 17 U.S.C.A. § 410(c)), a defendant may rebut the presumption "by showing that the work was not original or that the copyright registration was invalid," *id.* (citing *Fonar Corp.*

(continued...)

## 1.

In 2006 and 2007, Plaintiff worked with The Mountain to develop designs for a new line of t-shirts focused on outdoor activities, such as fishing, hunting and camping.  Plaintiff is a creator and licensor of creative content, and had previously developed an outdoor-themed line of designs known as "Off The Map."  Plaintiff owned an existing inventory of phrases and tag-lines that could be paired with images to create a unique, humorous design.  The Mountain had a general idea for the theme of its new lines of t-shirts, but it desired the use of Plaintiff's tag-lines and Plaintiff's creative ability and "imagination" to assimilate the text with the imagery and to develop the line.  Ultimately, the parties agreed to first select tag-lines owned or created by Plaintiff and to match such tag-lines with photographs obtained from stock licensing agencies. Following the selection of the tag lines, Plaintiff undertook the creative work, and engaged McAbee to create digital images combining the photograph and the tag-line.

Using this process, Plaintiff created 32 separate designs combining a photograph with one of its tag-lines.  Plaintiff provided the Designs to The Mountain in the form of layered Photoshop files known as "PSD" files.  In some cases, The Mountain would make minor changes to the images that were necessary to print the Designs on t-shirts, such as color changes.  The final t-shirt designs were subject to Plaintiff's approval.

In March 2007, following the creation and delivery of the Designs, The Mountain and LGL executed the License Agreement.  LGL expressly obtained rights to license the Designs from Plaintiff pursuant to a separate Master License Agreement between Plaintiff and LGL. Attachment 1 to the License Agreement lists the 32 Designs that were subject to the License

---

[2](...continued)
*v. Domenick*, 105 F.3d 99, 104-05 (2d Cir. 1997)).

Agreement.

The License Agreement provides, in pertinent part:

**2. GRANT OF LICENSE.**

A.    The parties agree that:

* * *

•    Off The Map is a property created, owned and controlled by Capital Concepts, Inc. dba bCreative, Inc. (hereinafter "bCreative") featuring original text, designs and layouts that incorporates the use of stock photography (the "Property").   Other than stock photo rights, all artwork, layouts, designs, text and any associated copyrights, trademarks, or other intellectual property rights in the Property are owned or controlled by bCreative.

**8.    INTELLECTUAL PROPERTY PROTECTION.**

**Ownership.**  It is understood and agreed that bCreative shall retain all right, title and interest in the original and any modifications to the Licensed Images and Property and may, but have no obligation to, register any copyrights that they have in the Licensed Images and Property.  The parties agree to execute any documents reasonably requested by bCreative or the other party to affect any of the above provisions.

The initial t-shirts that the Mountain produced bearing the Designs included a copyright notice depicting Plaintiff – *i.e.*, bCreative – as the copyright owner in the form requested by Plaintiff.  Pursuant to the License Agreement, The Mountain paid royalties to LGL based on its sales of t-shirts featuring the Designs.

In early 2009, The Mountain desired to renew the License Agreement regarding certain of the "Mountain Life" t-shirts, but the business relationship between Plaintiff and The Mountain had soured, and the parties were unable to agree upon renewal terms.  The License Agreement expired on March 1, 2009, triggering a three-month period during which The Mountain could sell its existing inventory of t-shirts bearing the Designs.  However, The Mountain admits that it

continued to sell t-shirts bearing the Designs licensed under the License Agreement for as long as it took to deplete its existing inventory of such shirts.  The Mountain had no license to continue to sell t-shirts bearing the Designs after May 31, 2009, but The Mountain paid royalties to LGL on sales of its existing inventory, and the royalty reports indicate that these sales continued at least through December 2009.

While selling its existing inventory, The Mountain decided that it would obtain licenses to use the photographs on which the Designs were based, and then create similar designs based on the Designs.  The Mountain obtained licenses from the stock photography companies to the same photographs used by Plaintiff to create the designs, and The Mountain created new PSD files combining the photographs and the same text provided by Plaintiff.  Michael Gallen, Vice-President of The Mountain, instructed Michael Sanford, a graphic designer employed by The Mountain, to "find the same image that was used to create these designs and use that to remake or redesign the image with small differences."  Mr. Sanford admitted that his purpose was to replicate, with small differences, the original Designs provided by Plaintiff, and when undertaking this work, he probably used a copy of the original Design as a reference guide.

The Mountain claims to have made minor changes to the fonts, borders, and the height and width of the frames, but the "new" designs appear to be fairly obvious copies of Plaintiff's Designs.[3]  Indeed, for each "new" design created by The Mountain, it maintained the same t-shirt SKU number and t-shirt name as it used for the t-shirt bearing the corresponding Design provided by Plaintiff.  Defendants continue to sell t-shirts bearing the disputed Designs and text, and they continue to earn revenue from such sales.

---

[3] Plaintiff's exhibits submitted in support of its opposition to Defendants' motion for summary judgment on the copyright claim include photographs of examples of The Mountain's "redesign" of Plaintiff's Designs.

**2.**

As I have already mentioned, Plaintiff engaged McAbee to create the PSD files for the Designs from the selected photograph and text.  McAbee was responsible for juxtaposing the applicable tag-line with the applicable photograph and for the creation of the final Designs, each of which were subject to Plaintiff and The Mountain's final approval.

On August 24, 2007, McAbee executed a document, entitled as a "Work for Hire Agreement," wherein he agreed that

> any and all drawings, illustrations, characters, text, layout, designs, ideas, digital files, or any other works (collectively, the "Creative Works") that I have created or worked on for either Capital Concepts, Inc., bCreative, Inc. or Offside, LLC (each individually, the "Hiring Party") in the past, or unless mutually agreed to in writing by me and the appropriate Hiring Party, will create or work on in the future, are "Works Made For Hire" within the meaning of the United States Copyright Act.

As the following quote indicates, the McAbee Agreement purports to divest and transfer all of McAbee's rights in the "Creative Works" to the Hiring Party:

> I agree that I have no ownership, rights, title, or interest in the Creative Works, nor will I challenge the Hiring Party's ownership, rights, title or interest in the Creative Works and their right to register intellectual property rights, and use or license the Creative Works at their sole discretion.  I agree to execute any documents attesting to this that may be necessary for registering copyright or trademark rights with the U.S. or other governments.  I do not hold any copyright or trademark interest in the Creative Works, including any changes, derivations, or substantially similar artwork or designs related to the Creative Works.

There is no dispute that Plaintiff was the "Hiring Party" with respect to the Designs.  The McAbee Agreement evidences McAbee's intent to transfer ownership of the Designs and the copyrights therein to Plaintiff, and his acknowledgment that Plaintiff would be entitled to register copyrights for the Designs in its own name.  Additionally, when questioned in deposition, McAbee gave the following responses, clearly indicating that he understood that this agreement transferred his rights to Plaintiff:

-9-

Q:      What is your understanding of this agreement that you signed?

A:      Well, that any work that I do for bCreative or Capital Concepts is in essence owned by them and is no longer – I have no legal right to that artwork.

Q:      And is this any work that you have done in the past, or just in the future?

                              * * *

A:      As far as, again, I would say with Scott [Gardiner, President of bCreative] and I's – I would assume that it was for past as well.  I actually think there's a – yes because it does say in the past.

On May 3, 2011 (prior to the filing of this suit), using the United States Copyright Office's online registration system, Plaintiff applied to register the copyright for 19 of the Designs. Plaintiff listed itself, bCreative, as the author of each of the 19 Designs, indicating that each was a work made for hire.[4]  Subsequently, the Copyright Office issued copyright registrations for each of the 19 Designs, with each registration having an effective date of May 3, 2011.

Plaintiff's claim for copyright infringement is based on these 19 designs.

                              *C.*

Defendants attack the validity of Plaintiff's copyrights, asserting that the McAbee Agreement and the subsequent copyright applications incorrectly characterize the designs created by McAbee as "works made for hire" as defined in the Copyright Act.  However, the "work made for hire" doctrine is but one way, among many, whereby an author can validly transfer ownership of his copyrights.

Wholly independent of the "work made for hire" doctrine, § 201(d) of the Copyright Act expressly authorizes the transfer of copyright ownership, in whole or in part, by "any means of

---

[4] Plaintiff states that it relied on the McAbee Agreement when listing itself as the author of the 19 Designs. The Copyright Office's filing guidelines state that the employer – a firm, an organization, or an individual – is to be listed as the author when the work is claimed as a work for hire.  *See* www.copyright.gov.

conveyance or by operation of law," regardless of the parties' relationship or the nature of the work involved.  17 U.S.C. § 201(d)(1).  With respect to transfers by conveyance, § 204(a) of the Copyright Act requires simply that the transfer be evidenced by a writing signed by the copyright owner.

Defendants correctly argue that, because McAbee was not an employee of Plaintiff, and because the Copyrighted Designs do not fall within any of the nine specific categories of specially commissioned works listed in the definition of a "work made for hire" in § 101(2) of the Copyright Act, they cannot legally constitute "works made for hire."  Defendants are also correct that the parties cannot confer "work made for hire" status upon a work by calling it a "work made for hire."  The question of whether a work is a "work made for hire" is a legal question that is determined by analyzing whether the requirements set forth in the definition of a "work made for hire" in the Copyright Act have been met.  *See Dumas v. Gommerman*, 865 F.2d 1093, 1105 (9th Cir. 1988) ("Works by independent contractors are works for hire only when the requirements of 17 U.S.C. § 101(2) are satisfied."), *rejected on other grounds by Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 736 n. 2 (1989); *Armento v. The Laser Image, Inc.*, 950 F. Supp. 719, 728-729 (W.D. NC. 1996) (holding that a specially commissioned work was a work made for hire under the statutory requirements of the Copyright Act, notwithstanding that the parties' agreement failed to refer to the work as "for hire" or as a "work made for hire.").  In sum, a work is either a "work made for hire" or it is not, and the parties' characterization of a work (or failure to characterize a work) as a "work made for hire" is not relevant to such determination.

As the Copyrighted Designs are not "works made for hire," the provisions of the Copyright Act relating to "works made for hire" and ownership thereof are inapplicable.

-11-

Accordingly, my analysis turns to whether Plaintiff acquired ownership of the Copyrighted Designs from McAbee under some other manner authorized by the Copyright Act. This is readily apparent. As discussed below, a transfer of copyright ownership requires only a writing signed by the owner of the rights conveyed. The McAbee Agreement is a written instrument transferring ownership of the Copyrighted Designs from McAbee to Plaintiff and, therefore, is sufficient to transfer ownership of the copyrights in the Copyright Designs to Plaintiff despite the misnomer in referring to and claiming ownership of McAbee's works as "works made for hire."

## 1.

The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, defines a transfer of copyright ownership as the "assignment, mortgage, conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright." 17 U.S.C. § 101. Section 201(d)(1), broadly authorizing "Transfer of Ownership," states that "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession." 17 U.S.C § 201(d)(1). The Copyright Act further specifies that transfers of copyright ownership, other than those by operation of law, must be in writing. The writing can be in any format, but the writing must be signed by the owner of the rights being conveyed. "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

When determining whether a written agreement is sufficient to transfer copyright ownership, a court's inquiry focuses on the intent of the parties. 3 Melville B. Nimmer and

David Nimmer, *Nimmer on Copyrights*, § 10.03[2] ("As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties."). There are no "magic words" that must be used – a written instrument that fails to use the words "copyright" or "transfer" can still be sufficient under § 204(a). *See Radio Television Espanola, S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 927-929 (9th Cir. 1999) ("No magic words must be included in a document to satisfy § 204(a). . . . Section 204(a) has a simple requirement in order for a grant of an exclusive license to be valid – put it in writing. If the parties really have reached an agreement, they can satisfy § 204(a) with very little effort."); *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) (explaining that the purpose of § 204 is to ensure that a copyright owner does not give away his rights "inadvertently" and to "enhance[] predictability and certainty of copyright ownership," and adding that "[s]ection 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta [*sic*]; a one-line pro forma statement will do."); *Armento*, 950 F. Supp. at 733-734 (upholding written agreement describing works as the "sole property" of the defendants as transferring copyright ownership of works to the defendants even though the agreement did not refer to "copyrights" or a "transfer" of any rights).

The transfer of McAbee's ownership interests in the Designs pursuant to the McAbee Agreement satisfies all of the requirements of § 204(a) of the Copyright Act. Significantly, the McAbee Agreement does not simply state that all works that he created or may create in the future are "works made for hire." Instead, it clearly evidences the parties' intent that McAbee was relinquishing and transferring to Plaintiff all rights in all creative works that he created for

Plaintiff prior to and after August 24, 2007. The McAbee Agreement shows that McAbee had no ownership interest in such works, and that he did not own any copyrights therein; that he would not challenge Plaintiff's ownership of such works; and that Plaintiff had the right to register the copyrights in such works in bCreative's name, and McAbee would execute any documents necessary in connection therewith. These terms clearly evidence the requisite agreement and intent of the parties that McAbee was transferring all rights in all works he had created and would thereafter create for Plaintiff. As the McAbee Agreement expressly includes *all* creative works that McAbee worked on for Plaintiff, it clearly covers the Copyrighted Designs. No plausible interpretation of the McAbee Agreement leaves ownership of the Copyrighted Designs with McAbee, and any such interpretation is contrary to McAbee's understanding of the McAbee Agreement as confirmed in his deposition testimony.

**2.**

Defendants challenge the validity of the McAbee Agreement on various other grounds, including that it was not also signed by Plaintiff and that it was not executed contemporaneously with the creation of the Copyrighted Designs. However, these arguments are unavailing, because the Copyrighted Designs are not "works made for hire," the McAbee Agreement is thus analyzed under § 204(a) of the Copyright Act, and none of the defects alleged by Defendants affects the validity of the McAbee Agreement under § 204(a).

Section 204(a) of the Copyright Act imposes no requirement that the recipient of the rights to the copyright also sign the agreement, or even that the agreement identifies the assignee. *See Sunham Home Fashions, LLC v. Pem-America, Inc.*, Civil Action No. 1:02-cv-06284, 2002 WL 31834477, *7 (S.D. NY Dec. 17, 2002) ("Although common sense, good business judgment and even a modicum of legal intuition dictate that a transfer should clearly name the transferee,

-14-

neither the statute nor the case law require it."). The express statutory language of § 204(a) requires only that the writing be signed by the "owner of the rights being conveyed." McAbee signed the written agreement, which is all that is required.

Section 204(a) of the Copyright Act permits a "memorandum of the transfer" as documentation of the conveyance of ownership, and there is no requirement that the writing be signed before or at the time of the transfer of rights. *See X-IT Products, L.L.C., v. Walter Kidde Portable Equipment, Inc.*, 155 F. Supp. 2d 577 (E.D. Va. 2001); *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 827 (3rd Cir. 2011). In *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982),[5] the United States Court of Appeals for the Second Circuit observed that, regarding § 204(a),

> since the purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses, the "note or memorandum of the transfer" need not be made at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement. In this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to invoke this provision against the licensee.

Indeed, the written agreement can be executed even after litigation alleging copyright infringement has been filed by the assignee. *See Barefoot Architect*, 632 F.3d at 827 (upholding written agreement transferring ownership nine years after creation of the works and four years after the lawsuit was filed).

Courts have consistently held that subsequently-executed written agreements confirming a

---

[5] The standard of review employed by the appellate court in *Eden Toys* has been superseded by statute. *See Weissmann v. Freeman*, 868 F.2d 1313, 1322 (2d Cir.1989). The former rule, followed in *Eden Toys*, allowed for an appellate court to evaluate *de novo* originality of a work when it could be determined entirely by reference to documentary evidence. *Weissmann*, 868 F.2d at 1322. Subsequently, the Federal Rules of Civil Procedure were amended so that findings of fact based on documentary evidence are not to be set aside unless clearly erroneous. *Id.; see also* Fed.R.Civ.P. 52(a)(6).

-15-

prior oral agreement to transfer copyrights are sufficient for the purposes of § 204(a), even when executed after the copyrights have been registered and after a lawsuit has been filed. *See Eden Toys, Inc*, *supra*; *X-IT Products*, *supra*; *Barefoot Architect*, *supra*; *Arthur Rutenberg Homes v. Drew Homes*, 29 F.3d 1529, 1532 (11th Cir. 1994); *Nimmer on Copyrights*, *supra*, § 10.03[3] (explaining that § 204(a) "apparently codifies the judge-made rule under the 1909 Act that, if a prior oral grant is subsequently confirmed in writing, it validates the grant *ab initio* as of the time of the oral grant").[6]  It is clear that the McAbee Agreement is sufficient to legally evidence the transfer of McAbee's rights in the Designs to Plaintiff.  However, in support of its opposition to Defendants' motion for summary judgment regarding the infringement claim, Plaintiff has filed a new Memorandum of Transfer executed by McAbee.  This Memorandum of Transfer reflects and confirms McAbee's intent to transfer his rights in the Designs to Plaintiff, and that McAbee has no current ownership interest in, or rights to the Designs or any of the copyrights therein. This Memorandum of Terms removes any and all doubt whether the McAbee Agreement is a sufficient written agreement under Section 204(a) of the Copyright Act.

## 3.

In any event, Defendants have no standing to challenge the validity of the McAbee Agreement.  The purpose of the writing requirement is to resolve disputes between owners of copyright and transferees about the status of the copyright; accordingly, it would be "anomalous to permit a third-party infringer to invoke this [writing] provision against the licensee." *Eden Toys, Inc.*, 697 F.2d at 36; *see also Imperial Residential Design, Inc. v. Palms Dev. Group, Inc.*,

---

[6] In addition to the McAbee Agreement, Scott Gardiner, the president of bCreative, testified that he and McAbee had a "verbal understanding" that everything that McAbee worked on for Plaintiff was owned by Plaintiff.

70 F.3d 96, 99 (11th Cir. 1995) ("where there is no dispute between the copyright owner and the transferee about the status of the copyright, it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement").

McAbee has not raised any dispute as to the rights he conveyed to Plaintiff and, in fact, he has confirmed his intention that the McAbee Agreement transfer all rights in the Designs to Plaintiff.  Defendants cannot legitimately complain that the allegations of their infringement should not survive because of a purported technical defect in how the McAbee Agreement characterizes the Designs.  Although Defendants attempt to cast their argument as "go[ing] to the core of who owns the copyright rights," and not relying upon "mere technicalities," their argument is based, at best, upon a "mere technicality."   Defendants attempt to challenge the validity of an agreement to which Defendants are not a party and which is contrary to the agreement, understanding, and intentions of the parties to the agreement.  Defendants do not (and apparently cannot) claim that they rightfully "thought that [they] owned a copyright, only to find out through litigation that their claim was invalid because of a snafu involving the written instrument."  *Barefoot Architect, Inc.*, 632 F.3d at 830.  The essence of Plaintiff's infringement allegations are that Defendants "knew or should have known that they were at least potentially infringing *someone's* copyright – even if they perhaps could not be precisely sure whose."  *Id*.  "[I]n a case in which there is no dispute between transferor and transferee" – as in the instant matter – "a third-party infringer . . . cannot evade liability by invoking § 204(a) and demanding a contemporaneously-drafted instrument."  *Id*.

*D.*

Furthermore, Defendants contractually waived any right to challenge the validity of Plaintiff's copyrights.  The License Agreement includes The Mountain's express agreement and

acknowledgment that Plaintiff owns the copyright in the Designs.   Additionally, when Defendants registered for access to Plaintiff's Web-site to review the content Plaintiff had available for licensing (as discussed further elsewhere in this opinion), Defendants accepted the terms of a Sublicense Agreement, § 11(a) of which states the following:

> LICENSEE MEMBER acknowledges and agrees that, as between LICENSEE MEMBER and bCREATIVE, LICENSEE MEMBER covenants that it shall not, at any time during or after the Term of Agreement, either dispute or contest, directly or indirectly, bCREATIVE's and/or Creative Member's exclusive ownership of all right and title, including all Intellectual Property rights, in any Licensed Works or Derivative Works, or claim any rights in or to any such Works
> excepts as expressly granted herein.

Thus, Defendants covenanted not to contest Plaintiff's rights to the intellectual property or the copyright in works that were licensed to The Mountain.  *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. Sept. 15, 2010) (finding that most courts have held web browser contracts enforceable where the user "had actual or constructive knowledge of the site's terms and conditions, and . . . manifested assent to them.") (citations omitted); *Gay v. CreditInform*, 511 F.3d 369, 390-391 (3d Cir. 2007) (enforcing choice of Virginia law under "terms of use" agreement).   In exchange for unfettered access to the creative content of Plaintiff's Web-site, The Mountain agreed that it would not challenge the validity of any intellectual property rights owned by Plaintiff.  And, in consideration for Plaintiff authorizing the licensing of the Copyrighted Designs to The Mountain pursuant to the License Agreement, The Mountain expressly acknowledged and agreed that Plaintiff owned the copyrights therein.  On this ground alone, I could deny Defendants' motion for summary judgment on the copyright infringement claim.   The Mountain is held to the contractual terms that it negotiated and for which it received valuable consideration.   These terms included an agreement not to raise the copyright ownership dispute that it currently raises in its motion for summary judgment.

-18-

*E.*

Defendants apparently take the position that, because Plaintiff indicated on the copyright applications that the Designs were "works made for hire," when Plaintiff should have indicated on the copyright applications that it claimed ownership of the Designs by virtue of a written assignment from McAbee, the copyright registrations Plaintiff obtained for the Copyrighted Designs are rendered invalid because the Designs do not strictly constitute "works made for hire" under the Copyright Act.  However, Defendants have made no claim or showing that Plaintiff was in any way attempting to perpetrate a fraud on the Copyright Office, and given that there is no dispute between McAbee and Plaintiff about the validity of the transfer or ownership of the Copyrighted Designs, Plaintiff has nothing to gain by misrepresenting the origin of its claims to ownership of the Designs.

An inadvertent omission on a copyright application will not invalidate a copyright registration.  *Service & Training, Inc., v. Data General Corp.*, 963 F.2d 680, 689 (4th Cir. 1992) ("appellants did not prove that any failure by [defendant] to advise the Copyright Office of the software's derivative nature was intentional"); *see also Bouchat v. Baltimore Ravens, Inc., et al*, 241 F.3d 350, 357 (4th Cir. 2000) ("This court held, in *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 689 (4th Cir.1992), that an inadvertent omission will not invalidate a copyright registration.").  In *Bouchat*, the plaintiff failed to state in his copyright application that his design was derivative of certain works that were in the public domain.  241 F.3d at 357.  The defendants argued that this error rendered the plaintiff's copyright registrations invalid, and thus deprived the district court of subject matter jurisdiction to hear the plaintiff's copyright infringement claim.  *Id.*  "The district court recognized that Bouchat failed to note the derivative nature of his authorship in his copyright application, but the court also found that there is no

evidence of any fraudulent or knowing misstatement with regard to the application."  *Id*.  The United States Court of Appeals for the Fourth Circuit affirmed, holding that the plaintiff's omission did not "invalidate the protection to which his drawing is otherwise entitled under his valid copyright registration."  *Id*. (citing *Service & Training*, 963 F.2d at 689).  The Court further stated that "[a]ccidental but harmless mistakes in a copyright application do not subsequently preclude an infringement action against an alleged copier."  *Id*.  *See also Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 828 (11th Cir. 1982) (common element among cases invalidating a copyright based on omissions or misrepresentations in the application "has been intentional or purposeful concealment of relevant information.  Where this element of 'scienter' is lacking, courts generally have upheld the copyright."); *Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 708 (6th Cir. 1956) ("innocent misstatement . . . in the affidavit and certificate of registration, unaccompanied by fraud," does not invalidate copyright); *Johnson v. Automotive Ventures, Inc.*, 890 F. Supp. 507, 511 (W.D. Va. June 21, 1995) (in the absence of evidence of intentional wrongdoing and prejudice to the defendants, expressly rejecting challenges to the validity of copyright registrations based on errors in the copyright application); *Ross Products*, *Inc. v. New York Merchandise Co.*, 242 F. Supp. 878, 879 (S.D. N.Y. June 24, 1965) (cases overlooking omissions or misstatements emphasize "that the errors involved were honest, innocent and not intended to be misleading") (citations omitted).

In cases where the copyright claimant possesses an assignment of rights but mistakenly claimed ownership in the copyright applications on the basis that the work is a "work made for hire," district courts have refused to invalidate the resulting copyright registrations or to even rebut the presumption of validity bestowed by a copyright registration.  *See Sunham Home Fashions*, 2002 WL 31834477, *5 ("[w]ithout evidence that the registration applications were

filled out with the active intention of misleading the Copyright Office, the misrepresentation does not rise to the level of fraud" sufficient to "rebut the presumed validity of the copyrights" (citation omitted); *Lida v. Texollini*, 768 F. Supp. 439, 442 (S.D. N.Y. July 16, 1991) ("Texollini has adduced no evidence that Lida was engaged in fraudulent conduct by these errors in its application.  An innocent or inadvertent omission will not invalidate a copyright registration. . . . It is certainly not outlandish to think that Lida considered itself the originator of the copyright design since it purchased rights which are attendant to that status.  The misrepresentation can easily be construed as inadvertent and unintentional.  Therefore, under these circumstances, there is insufficient evidence to rebut the presumption of validity for Lida's copyright.") (citation omitted).

In this case, Defendants have made no direct allegation or showing that any mistake made by Plaintiff on its copyright applications was anything other than accidental, harmless, and unintentional.  As I have already observed, there is no plausible argument that the mistake was knowingly made to mislead the Copyright Office and to confer a benefit or advantage on Plaintiff, because Plaintiff could obtain no benefit or advantage from the error.  Nor is there any plausible argument that Defendants have been prejudiced in any way by the mistake.  Lacking any suggestion – not to mention evidence – that the mistake was an intentional fraud, Defendants' motion for summary judgment on Plaintiff's copyright infringement claim must fail.

## II.

### A.

Plaintiff also seeks redress for the following:  The Mountain's breaches of a separate contract with Plaintiff (Count II); Defendants' breaches of two separate contracts with Plaintiff

(Count III); Mountain Retail's tortious interference with the contracts between The Mountain and Plaintiff (Count IV; and Defendants' unjust enrichment from their unauthorized use of Plaintiff's non-copyrightable creative content and work product (Count V).  These claims seek vindication for violations of Plaintiff's legal rights separate and distinct from the copyrights underpinning its claim for copyright infringement.  These claims concern Defendants' use of Plaintiff's short phrases and tag-lines, which does not fall within the subject matter of copyright protection under the Copyright Act, 17 U.S.C. § 100 *et seq.*  Section 301(b)(1) of the Copyright Act expressly displaces preemption with respect to "subject matter that does not come within the subject matter of copyright"; accordingly, Plaintiff's state law claims cannot be preempted under the Copyright Act.

Plaintiff's rights that are the subject of its breach of contract claims are "qualitatively different" from the rights that are the subject of its claim for copyright infringement, because the contract claims contain an "extra element" beyond a mere allegation of copyright infringement.  As such, they are not preempted under the Copyright Act.  Additonally, because the rights protected under these contracts are "qualitatively different" from those asserted under the copyright claim, Plaintiff's claim for tortious interference with the contracts is not preempted under the Copyright Act.  And, Plaintiff's allege that Defendants were unjustly enriched by their use of Plaintiff's materials that fall outside the scope of copyright protection, and thus the unjust claim must also survive.

*B.*

Defendants assert blanket preemption based on the Copyright Act.  The following factual summary is specifically pertinent to Defendants' preemption arguments, and this discussion

supplements the facts set forth earlier in this opinion.[7]

## 1.

During the course of their relationship, the parties entered into several agreements regarding different aspects of the various claims in this case.

### a. The Site User Agreement

A core function of Plaintiff's business involves assisting creators of content to license their content to third parties who are interested in and capable of commercializing such content. In furtherance of that function, Plaintiff operates a Web-site (the "Web-site") at which Plaintiff displays content that it has available for licensing, together with the content of authorized individuals known as "Creative Members." Individuals or entities who register at the Web-site and are who are approved by Plaintiff ("Licensee Members") can access and peruse this content for the purposes of considering whether to license such content from Plaintiff. To protect the content displayed on the Web-site from being misappropriated by registered Licensee Members, use of the Web-site is governed by the terms of a Site User Agreement (the "Site User Agreement"). Licensee Members are further bound by the terms of a Licensee Member Sublicense Agreement (the "Sublicense Agreement") which is posted on the Web-site.

On May 26, 2003, in furtherance of The Mountain's interest in licensing content from Plaintiff, Michael Gallen, Vice-President of The Mountain, registered The Mountain on Plaintiff's Web-site as a Licensee Member, thereby accepting and consenting to the general terms of the Site User Agreement and the specific terms of the Sublicense Agreement. Defendants do not dispute that Mr. Gallen registered at the Web-site and that there were

---

[7] The summary judgment standard of review is stated in note 2, *supra*.

agreements posted on the Web-site.  Mr. Gallen understood that Defendants were not allowed to use content accessed at the Web-site without obligation to Plaintiff; however, he has acknowledged that was not concerned about the reading the terms of the Site User Agreement and the Sublicense Agreement, and that he had done whatever he had to do to look at the content on the Web-site.

The Site User Agreement provides that a Licensee Member may view content on the Web-site, but is prohibited from using the content for any commercial purposes, and it includes the following terms:

- All content on the Website is confidential and proprietary subject matter of bCreative.

- Licensee Members are granted a limited, non-exclusive license to access, view, display and download content posted on the Website for the purposes of searching content for licensing and only as expressly permitted by the Sublicense Agreement.

- Licensee Members may not copy, sell, license, create derivative works from, or use any content on the Website except as expressly permitted by the limited licenses granted in the Site User Agreement and the Sublicense Agreement.

*b.  The Sublicense Agreement*

The Sublicense Agreement authorizes a Licensee Member to acquire, in effect, a limited license to use selected content displayed at the Web-site upon terms outlined under an agreed schedule.  The terms of the Sublicense Agreement also apply to any content or creative materials that Plaintiff may provide to the Licensee Member in other formats, such as paper, fax or e-mail. Section 6(a) of the Sublicense Agreement prohibits a Licensee Member's use of any content or materials provided by Plaintiff that is not expressly authorized by the Sublicense Agreement. Under the Sublicense Agreement, the Licensee Member's obligations to pay royalties for

Plaintiff's content "shall survive expiration or termination of this Agreement and will continue for the longer of any period LICENSEE MEMBER continues to sell the licensed products, any Royalty remains unpaid, or any obligation in this Agreement is outstanding."

### c. The License Agreement

As discussed previously regarding the motion for summary judgment on Plaintiff's copyright infringement claim, in March 2007 Looking Good Licensing, LLC ("LGL"), acting with Plaintiff's consent under a Master License Agreement previously granted to LGL by Plaintiff, entered into a License Agreement with The Mountain to provide various unique designs depicting skiing, snowboarding, camping and other outdoor activities (the "Designs"), which were part of Plaintiff's property line known as "Off the Map."  The Designs created by Plaintiff generally consisted of images created from the combination of a photograph with a tag-line owned or created by Plaintiff, and the Designs were to be included as a line of t-shirts to be marketed by The Mountain under the name "Mountain Life."

Prior to the execution of the License Agreement, representatives of Defendants accessed Plaintiff's Web-site on numerous occasions to view Plaintiff's tag-lines for potential use on t-shirts for the Mountain Life line.  Additionally, Plaintiff provided Defendants with numerous tag-lines that would be appropriate for use on the Mountain Life line of products.

Ultimately, The Mountain licensed 32 of the Designs, which combined an image from a stock photograph with a tag-line owned by Plaintiff.  The License Agreement granted The Mountain an exclusive license to design, manufacture, and sell t-shirts incorporating the 32 specific Designs selected by The Mountain for an initial term that expired on March 1, 2009. The Mountain agreed to pay LGL a royalty of eight percent (8%) of the net sales price of each t-shirt.

### d. The Licensed Text Agreement

Following the execution of the License Agreement, The Mountain wanted to license additional text and creative tag-lines directly from Plaintiff for use with its own photographs and designs.  In other words, instead of Plaintiff creating a design consisting of a creative tag-line and an image derived from a photograph, The Mountain simply wanted to use Plaintiff's text and tag-lines, and to create its own designs using such text and tag-lines.

Plaintiff agreed to license certain tag-lines (the "Licensed Text") to The Mountain for use on Mountain Life t-shirts during the term of the License Agreement in exchange for The Mountain paying directly to Plaintiff a royalty of 5% of the net sales of each t-shirt.  This agreement (the "Licensed Text Agreement") was memorialized in e-mail exchanges between Mr. Gallen and Mr. Gardiner, and it was understood and agreed that the Licensed Text Agreement would be separate and distinct from the License Agreement.

The Licensed Text Agreement was expanded in September 2007 to include creative text and lines provided by Plaintiff for a separate line of zoo-based t-shirts (the "Zoo Lines").

### 2.

In accordance with the License Agreement, The Mountain proceeded to use the Designs and to produce, advertise, and sell t-shirts bearing the Designs.  In accordance with the Licensed Text Agreement, the Mountain proceeded to produce, advertise and sell t-shirts bearing the Licensed Text and the Zoo Lines.

The License Agreement expired on March 1, 2009, and the Licensed Text Agreement for the Licensed Text and the Zoo Lines expired, too.  Thereafter, The Mountain was entitled to a three-month sell-off period for existing inventory; the sell-off period expired on May 31, 2009.

On June 19, 2009, The Mountain was notified in writing by LGL that the License

Agreement was terminated.  Plaintiff also notified The Mountain that it had no continuing right to continue selling t-shirts incorporating the Licensed Text and the Zoo Lines.

Notwithstanding the termination of the License Agreement and the Licensed Text Agreement, Defendants continued to sell t-shirts bearing the Licensed Text as if the Licensed Text Agreement was still in effect.  Plaintiff also discovered that Defendants were continuing to sell t-shirts bearing text and creative tag-lines that either had been accessed by Defendants from Plaintiff's Web-site or subsequently provided by Plaintiff to Defendants pursuant to the terms of the Sublicense Agreement, and not licensed by The Mountain under the License Agreement for use in connection with the Designs or licensed by Plaintiff pursuant to the Licensed Text

### 3.

In Count II, Plaintiff alleges that, following the termination of the License Agreement, The Mountain breached the parties' separate agreement concerning The Mountain's use of the Licensed Text and the Zoo Lines by continuing to sell t-shirts bearing this text.  Plaintiff alleges that it has received no benefit, income, or revenue from The Mountain's violation of the Licensed Text Agreement.  The allegations set forth in Count II clearly do not concern any of the Designs, the Copyrighted Designs, or any other materials or works other than the specific tag-lines described in paragraphs 41 and 45 of the complaint.

In Count III, Plaintiff alleges that Defendants breached the Site User Agreement and the Sublicense Agreement by using text and tag-lines that were accessed from the Web-site or otherwise provided by Plaintiff to Defendants in connection with the parties' licensing discussions.  This text is defined in the complaint as the "Creative Works," concerning only Plaintiff's text that was not included in the Designs licensed under the License Agreement and was not the subject of the Licensed Text Agreement.  The allegations in Count III pertain only to

Defendants' use of text that is not subject to the License Agreement or the Licensed Text Agreement.   Such allegations to do not apply to or concern any of the Designs or the Copyrighted Designs.

Count IV alleges tortious interference with contract against Mountain Retail regarding the Licensed Text Agreement.   Plaintiff alleges that Mountain Retail improperly induced the Mountain to breach the Licensed Text Agreement and, to the extent Mountain Retail argues that it is not a party to the Site User Agreement or the Sublicense Agreement, Plaintiff alleges that Mountain Retail improperly induced the Mountain to breach these agreements.   These allegations pertain only to the Licensed Text Agreement, the Site User Agreement, and the Sublicense Agreement, and the specific text and tag-lines that are the subject of those agreements.   They do not concern any of the Designs, the Copyrighted Designs, or any other materials or works.

Count V asserts an alternative claim for unjust enrichment, alleging that Defendants have been unjustly enriched in that they have reaped the benefits of Plaintiff's investment of time, resources, and materials such that equity would impose a contract requiring payment.

*C.*

**1.**

Plaintiff's claims for breach of contract and tortious interference with contract (Counts II, III, and IV) are not preempted by the Copyright Act.   These claims relate solely to Defendants' use of Plaintiff's tag-lines, and short phrases of this nature fall outside the subject matter of copyright.

Preemption under the Copyright Act does not apply to content or materials that are not subject to copyright protection.   Title 17 of the United States Code, section 301, states in

-28-

pertinent part:

> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to –
>
> (1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103 including works of authorship not fixed in any tangible medium of expression.

See also *Rosciszewski v. Arete Assocs.*, 1 F.3d 225, 229 (4th Cir. 1993) ("§ 301(a) preempts state-law claims if 'the work is within the scope of the "subject matter of copyright" as specified in 17 U.S.C. §§ 102, 103' and 'the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106'") (quoting *Ehat v. Tanner*, 780 F.2d 876, 878 (10th Cir. 1985), *cert. denied*, 479 U.S. 820 (1986)).

Plaintiff's claims under Counts II and III relate solely to Defendants' unauthorized use of short tag-lines, such as "Why Golf?  Because You Can't Play Tennis With a Beer."  Counts II and III do not relate to any of the Copyrighted Designs or to any content or materials other than short phrases and tag-lines.

The scope of the Copyright Act does not extend to the  individual short text and tag-lines provided by bCreative to the Defendants standing alone.  Part 37, section 202.1 of the Code of Federal Regulations states that

> [t]he following are examples of works not subject to copyright protection and applications for registration of such works cannot be entertained:
>
> (a)     Words and short phrases such as names, titles and slogans; familiar symbols or designs; mere variations of typographic or ornamentation, lettering or coloring; mere listing of ingredients or contents.

See also *Innovative Legal Mktg., LLC v. Mkt. Masters-Legal*, 852 F. Supp. 2d 688, 699 (E.D. Va. Mar. 30, 2012) ("individual lines and phrases do not receive copyright protection") (citing *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996)).

-29-

Accordingly, the tag-lines provided by Plaintiff do not fall within the "subject matter of Sections 102 and 103 of the Copyright Act," and Plaintiff's claims for breach of contract, which are premised solely on the Defendants' unauthorized use of such text, and not on any designs or other works that may be subject to copyright protection, cannot be preempted. The Copyright Act does not apply to short phrases and tag-lines and affords Plaintiff no remedy for Defendants' allegedly unauthorized use of its tag-lines.[8] Apparently recognizing that much of its content is in the form of short text and tag-lines that are not eligible for copyright protection, Plaintiff has sought to protect its property interest in such content through the use of contracts.

Likewise, Plaintiff's claim for tortious interference with contract pertains solely to contracts between Plaintiff and The Mountain controlling The Mountain's use of Plaintiff's tag-lines. Such contracts, and Plaintiff's allegations regarding Mountain Retail's tortious interference therewith, do not relate to any content that falls within the subject matter of copyright protection and, therefore, cannot be preempted.[9]

---

[8] It would be illogical to grant judgment on the one hand to Defendants regarding the contract claims on the basis that the Copyright Act preempts such claims and affords the exclusive basis for relief, and then find on the other hand that the Copyright Act bars a claim for which it provides no relief.

[9] Defendants attempt to characterize Plaintiff's claim for tortious interference with contract as seeking protection for copyright-protected matters. However, paragraph 87 of the complaint is quite clear that the material at issue in the tortious interference claim is the non-copyrightable Licensed Text and Zoo Lines. Paragraph 87 of the complaint states the following:

> Mountain Retail, having knowledge of the licenses entered into between bCreative and The Mountain for the Licensed Text and the Zoo Lines, as described above, improperly induced The Mountain to breach such agreements and participated with The Mountain to reproduce, create, advertise, publicly display, distribute and/or sell products containing or incorporating the *Licensed Text* and the *Zoo Lines* in violation of bCreative's *contractual* and *proprietary* rights therein.

(Emphasis added).

## 2.

Furthermore, because each of Plaintiff's claims for breach of contract are "qualitatively different" from its claim of copyright infringement, the Plaintiff's claims for breach of contract are not preempted.  A long line of precedents hold that "[a] state cause of action avoids preemption if the action requires an 'extra element [that] transform[s] the nature of the action,'" *Tire Engineering v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 309 (4th Cir. 2012) (quoting *Laws v. Sony Music Entm't Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006)), "making it 'qualitatively different from a copyright infringement claim,'" *id.* (quoting *Computer Assocs. Int'l Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)).  *See also Rosciszewski, supra*, 1 F.3d at 230 (same); *Progressive Corp. v. Integon P&C Corp.*, 947 F.2d 942 (Table), 1991 WL 218010, *6 (4th Cir. 1991) (same); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 925-26 (4th Cir. 1988) (where a claim for breach of contract arises from a separate agreement, preemption is not appropriate); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454-55 (7th Cir. 1996) (same)[10]; *Nimmer on*

---

[10] In *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) (citing, among others, the Fourth Circuit's opinion in *Acorn Structures*), the United States Court of Appeals for the Seventh Circuit rhetorically questioned, "[A]re rights created by contract 'equivalent to any of the exclusive rights within the general scope of copyright'?" *id.* at 1454, and embarked on the following discussion, *id.* at 1454-55:

> Three courts of appeals have answered "no."  *National Car Rental System, Inc. v. Computer Associates International, Inc.*, 991 F.2d 426, 433 (8th Cir.1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir.1990); *Acorn Structures, Inc. v. Swantz, 846 F.2d 923, 926 (4th Cir.1988)*. The district court disagreed with these decisions [citation omitted], but we think them sound.  Rights "equivalent to any of the exclusive rights within the general scope of copyright" are rights established by law – rights that restrict the options of persons who are strangers to the author.  Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying.  A copyright is a right against the world.  Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create "exclusive rights."
>
> * * *
>
> [W]hether a particular license is generous or restrictive, a simple two-party contract is not

(continued...)

*Copyrights*, *supra*, § 1.01[B][a](i) ("preemption should be found absent to the extent that a breach of contract claim alleges more than simple reproduction (or adaptation, distribution, etc.) of a copyrighted work").

Both of the breach of contract counts alleged in Counts II and III contain promises satisfying the "extra element" standard and, therefore, Defendants' claim of preemption will be denied as to those counts.

The Licensed Text Agreement, later expanded to include the Zoo Lines, explicitly provided that The Mountain could use Plaintiff's text and creative lines in conjunction with The Mountain's own photographs and designs in exchange for payment of a 5% royalty of net sales of each t-shirt sold.  Plaintiff's allegations of breach include the allegation that The Mountain has not paid royalties promised to Plaintiff, and it is this promise to pay, not the mere use of the text and creative lines, that provides the extra element separating this claim from an ordinary copyright infringement claim.  The promise to pay, as well as the contractual provisions regarding the use of Plaintiff's non-copyrightable property, separates this claim from a copyright infringement claim, and thus preemption does not apply.

As for Count III, breach of contract claims based on violations of the terms of use agreements on Web-sites are "qualitatively different" from copyright infringement claims.  *See Cvent, Inc.*, *supra*, 739 F. Supp. 2d at 936.  In *Cvent*, the plaintiff alleged that the defendant had copied (or "scraped") protected information off of Cvent's Web-site for its own use.  *Id*. at 930. Cvent claimed that this scraping violated the Terms of Use found on its Web-site.  *Id*. at 936.

---

[10](...continued)
       "equivalent to any of the exclusive rights within the general scope of copyright" and therefore may be enforced.

The defendants argued that the contract claim was preempted by the Copyright Act. *Id*. The court disagreed with the defendants, holding that a violation of the Terms of Use contract was "qualitatively different" than a copyright claim; however, the court found that the plaintiff failed to make a claim for breach of contract because it could not show as an initial matter that defendants had agreed to the Terms of Use. *Id*. at 936-937.

Here, Plaintiff has sufficiently shown that it required The Mountain and its agents to register at the Web-site before proceeding any further into the Web-site and obtaining access to content, and this extra element found within the Site User Agreement and the Sublicense Agreement creates the difference which renders preemption inapplicable. Additionally, like the plaintiff in *Cvent*, Plaintiff alleges that The Mountain in effect "scraped" its Web-site by using unlicensed material removed from the Web-site in violation of the Site User agreement and the Sublicense Agreement. This material was then used to create and sell t-shirts. This unauthorized theft of non-copyrighted material from the Web-site is not preempted by the Copyright Act. *See Cvent*, 739 F. Supp. 2d at 936-937. Furthermore, the Sublicense Agreement contains a provision that The Mountain's obligation to pay royalties survives even the termination of the agreement. This obligation to pay even after the expiration of the license is another "extra element" removing this claim from the purview of copyright preemption.

*D.*

Plaintiff's unjust enrichment claim is not preempted, either, because it is not based solely on an allegation of copyright infringement.[11] An unjust enrichment claim can survive

---

[11] Under Virginia law, the elements of unjust enrichment are as follows: (1) a benefit conferred on the defendant by the plaintiff; (2) the defendant's knowledge of the conferring of the benefit; and (3) the defendant's acceptance or retention of the benefit under "circumstances that render it inequitable for the

(continued...)

preemption if defendants were enriched by "material beyond copyright protection." *Microstrategy, Inc. v. Netsolve, Inc.*, 368 F. Supp. 2d 533, 537- 538 (E.D. Va. March 13, 2005).

For example, in *Cvent*, the court found that a claim of unjust enrichment was not preempted when it was based on the defendant's "derivation of commercial benefit from its unauthorized scraping and repackaging of Cvent's *products*," because such an allegation "states a claim for relief that is separate and distinct from a claim for copyright infringement based upon the theft of [Cvent's] copyrightable *ideas*." *Cvent*, 739 F. Supp. 2d at 938.

Here, it appears that the unjust enrichment claim is based on enrichment that includes both material protected by copyright, *e.g.*, designs, and material that is not copyright protected, *e.g.*, text and tag-lines.  Because preemption does not apply to matters that are not copyrightable under 17 U.S.C. § 301, and Plaintiff's claim for unjust enrichment is not based exclusively on copyright subject matter, I will deny Defendants' motion for summary judgment on the ground that the claim is preempted by the Copyright Act.  In any event, Defendants' argument regarding the unjust enrichment claim is inappropriate for resolution at the summary judgment stage, even with respect to copyrightable subject matter, given that Defendants challenge Plaintiff's copyrights in the Copyrighted Designs.  The summary judgment record indicates that Defendants intend to argue facts and law at trial in support of their position that Plaintiff has no protected copyrights in the Designs.  If  Defendants are correct and the Designs are not subject to copyright protection, then Plaintiff's claim for unjust enrichment is not preempted. Accordingly, to the extent that the claim relates to copyrightable subject matter, I cannot reach the preemption

---

[11](...continued)
defendant to retain the benefit without paying for its value." *Nossen v. Hoy*, 750 F. Supp. 740, 744-45 (E.D. Va. 1990) (citations omitted).

issue regarding the unjust enrichment claim until this issue is resolved at trial.  *See Cvent*, 739 F. Supp. 2d at 938 (finding that the defendant's preemption argument with respect to an unjust enrichment claim was "premature").


## III.

For the stated reasons, Defendants' motions for summary judgment will be denied.  An appropriate order accompanies this memorandum opinion.

Entered this 30th day of December, 2012.


_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE