IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

CAPITAL CONCEPTS, INC.,
*doing business as*
BCREATIVE, INC.,

Plaintiff,

v.

THE MOUNTAIN
CORPORATION, ET AL.,

Defendants.

CIVIL ACTION NO. 3:11-CV-00036

MEMORANDUM OPINION

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Presently before me is Plaintiff's[1] motion, filed under seal, styled as a "Motion to Exclude Defendants' Expert Report and Expert Testimony and Motion in Limine to Preclude Defendants, The Mountain Corporation ('The Mountain') and Mountain Retail, LLC ('Mountain Retail'), from Adducing Evidence Regarding Profitability."   For the reasons and to the extent stated herein, Plaintiff's motion (docket no. 45) will be granted.[2]

## I.

The facts in this case are set forth at some length in my memorandum opinion and order

---

[1] Plaintiff is Capital Concepts, Inc., doing business as bCreative, Inc. ("bCreative").

[2] Also pending on the docket is Defendants' "Motion for Daubert Hearing Including Voir Dire of Defendants' Expert on Plaintiff Capital Concepts, Inc. d/b/a bCreative, Inc's Motion To Exclude Defendants' Expert Report and Expert Testimony and Motion in Limine to Preclude Defendants from Adducing Evidence of Profitability," which is conjoined with the subject matter of Plaintiff's instant motion.  *See* docket no. 90. I will address the merits and distinctions raised in that motion by separate memorandum opinion and order. Regarding Defendants' motion (docket no. 90), no further briefing is necessary, and any additional briefing of that matter will not be well-taken.

denying Defendants' motions for summary judgment,[3] and I will not restate them here.  Suffice it to say that The Mountain is a manufacturer, distributor, and seller of t-shirts throughout the United States.  Mountain Retail, which is owned by The Mountain, sells t-shirts manufactured by The Mountain.  Pursuant to a license agreement, Plaintiff provided The Mountain with 32 shirt designs.  Plaintiff obtained copyright registrations for 19 of the designs.  The Mountain placed these designs on t-shirts, which Defendants sold throughout the United States as part of a line of t-shirts called "Mountain Life."  The complaint in this matter alleges that, when the license agreement ended, Defendants continued to manufacture, distribute, and sell t-shirts bearing Plaintiff's designs and text, including Plaintiff's copyrighted designs.

## II.

### A.

Plaintiff's instant motion was filed under seal pursuant to a stipulated protective order (docket no. 25) and an order (docket no. 44) granting a motion seeking leave to file the instant motion under seal.  Given Plaintiff's concerns for complying with the terms of the protective order, I will discuss only in general, non-confidential terms Defendants' business and financial

---

[3] Regarding Count I of the complaint, alleging copyright infringement, Defendants contended that, because of errors in Plaintiffs' copyright registrations, Plaintiff did not have a valid copyright that could be infringed. Regarding the claims in Count II (breach of contract), Count III (breach of contract), Count IV (tortious interference with contract) and Count V (unjust enrichment), Defendants moved for summary judgment on the ground that the claims are preempted by the Copyright Act.  I determined that Plaintiff's copyright registrations are valid and that it is entitled to a jury trial on its Count I claim for copyright infringement, and that the claims in Counts II, III, and IV seek vindication for violations of Plaintiff's legal rights separate and distinct from the copyrights underpinning its claim for copyright infringement, and that such claims are not preempted by the Copyright Act, because those claims concern content that does not fall within the subject matter of copyright protection under the Copyright Act.

information that has been disclosed in the briefing of the instant motions.[4]

### B.

### 1.

Defendants designated Andrea Burke, The Mountain's controller, as their corporate designee under Rule 30(b)(6) of the Federal Rules of Civil Procedure to testify regarding financial topics, including the revenues and profits Defendants earned from their sales of the allegedly infringing t-shirts. According to Ms. Burke, The Mountain tracks revenues by large product categories, *e.g.*, long-sleeved t-shirts as a whole. The Mountain does not track gross or net profitability of individual t-shirts, and it does not detail expenses at the large product category level. Instead, it applies an average "cost" incurred for all products to determine the profits derived from a specific category of t-shirts.

---

[4] The order granting the motion to seal may have been improvidently granted, as the motion seeking leave to file under seal did not provide sufficient "reasons why alternatives to sealing are inadequate," *see* W.D. Va. Gen. R. 9(c)(2), and it would have been more appropriate to docket redacted, publicly accessible documents in tandem with the sealed documents, *see Va. Dep't of State Police v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004) (case law protects generally the right of public access to documents filed in court, both under the First Amendment and the common law).

In any event, I note that the protective order designated Defendants' business and financial information as "confidential," and in seeking leave to file the instant motion under seal, Plaintiff asserted that sealing its motion and accompanying memorandum was necessary to comply with the stipulations and the protective order and to protect Defendants' confidential business and financial information from unnecessary disclosure. Plaintiff's supplemental memorandum on its instant motion was likewise filed under seal.

However, Defendants' "Motion for Daubert Hearing Including Voir Dire of Defendants' Expert on Plaintiff Capital Concepts, Inc. d/b/a bCreative Inc.'s Motion to Exclude Defendants' Expert Report and Expert Testimony and Motion in Limine to Preclude Defendants from Adducing Evidence Regarding Profitability" (which, as I previously noted, *see supra* n. 2, is conjoined with the subject of the instant motion) and the correspondent briefing was *not* filed under seal. Additionally, I conducted a hearing on January 14, 2013, regarding, *inter alia*, these motions. As Defendants point out in the memorandum accompanying their motion, at that hearing, I "heard argument on bCreative's motion and the Mountain's opposition, including the methodology used by Mr. Maloney and the information provided by The Mountain to Mr. Maloney," and Defendants contend that, "[a]s . . . discussed at the hearing on the pending motion, Mr. Maloney, and to the extent she is providing calculations, Ms. Burke, properly used the methodology set forth by the Fourth Circuit (as well as other circuits) in calculating the Mountain's net profits attributable to the disputed shirts . . . ."

The Mountain imposed this same approach in calculating profits for the allegedly infringing t-shirts. To determined the net profits from those revenues, The Mountain grouped a variety of specified and unspecified direct and indirect costs together, and then applied those costs to the allegedly infringing t-shirts. These costs included ink, general payroll, specific payroll for three employees involved in the production of Mountain Life t-shirts, "other payroll," "shipping/packing/picking payroll," rent, utilities, administrative expenses, shipping supplies, and "additional costs of goods sold not captured above."

The Mountain did not determine whether any of these costs were actually related to the production of the allegedly infringing t-shirts, or actually increased as a result of their production. Instead, The Mountain simply allocated a percentage of "all of the costs that are associated with producing a Mountain Life shirt" specifically to the allegedly infringing t-shirts, without regard to whether those expenses were of actual assistance in their production, distribution, or sale. Ms. Burke testified that, despite applying these expenses to the allegedly infringing t-shirts, there is no direct evidence that they constitute direct costs or that any of the indirect costs allocated to the allegedly infringing t-shirts were actually incurred as a result of the production and sale of those products.[5]

## 2.

Defendants have designated Richard Maloney, CPA, ABV, as an expert witness. Mr. Maloney produced an expert report dated May 30, 2012, setting forth his opinions regarding the gross profits and net profits generated by Defendants from their sale of the allegedly infringing t-shirts. Mr. Maloney rejected Ms. Burke's approach, in part, instead calculating The Mountain's

---

[5] Using Ms. Burke's approach, The Mountain's profit margin was approximately 7%, or about $0.58, per allegedly infringing t-shirt. *See also* n. 6, *infra*.

net profits "per category of shirt," *e.g.*, "Wal-Mart," "Mountain Life," and "Other Mountain," that are even broader than Ms. Burke's categories.  The allegedly infringing t-shirts are a subset of the "Mountain Life" category of t-shirts, but, as Mr. Maloney reported, "The Mountain does not calculate expenses for the subset."

Neither did Mr. Maloney.  Instead, he allocated to each category of t-shirt The Mountain's indirect cost of goods sold and its administrative expenses as a percentage of the total, regardless of whether those costs and expenses were incurred as a result of the production, distribution, or sale of the allegedly infringing t-shirts.  More specifically, Mr. Maloney first determined the "direct costs of goods sold" for each category of t-shirts sold by Defendants, including the "Mountain Life" category, which includes the allegedly infringing t-shirts.  Presumably, these "direct costs" include, for example, the cost of blank white t-shirts, dyes, and inks.  However, Mr. Maloney made no independent determination regarding what costs were included within "direct costs of goods sold."  Rather, Mr. Maloney relied solely upon a schedule provided by Ms. Burke, which he attached as an exhibit to his report, but his report does not analyze or explain what costs have been included in his "direct costs of goods sold" regarding the "Mountain Life" category of t-shirts.  The exhibit indicates that Defendants were unable to allocate all of their direct costs of goods shown on their financial statements to a particular category of t-shirts, which resulted in an "All – not able to separate" category of costs.  In his report, Mr. Maloney categorized these costs as "indirect costs" and allocated a portion to each category of t-shirt on a percentage of sales basis, *i.e.*, based on the percentage of revenues represented by each category of t-shirts to the total revenues earned by Defendants from all sales of t-shirts.

Thus, relying on the summary information provided by The Mountain, Mr. Maloney's calculation of The Mountain's gross profits from the sale of t-shirts with the "Mountain Life"

category is based on his determination of revenues earned from such sales less the amount of direct costs of goods sold and his allocation of "indirect costs."  Recognizing that it was not possible to allocate Defendants' overhead and general and administrative expenses to each category of t-shirts sold by Defendants, Mr. Maloney determined which of those expenses were not applicable to the "Wal-Mart" category of t-shirts on a percentage of sales basis.  Based on the information provided by Mountain (in the exhibit previously mentioned), he separately calculated the sales commissions paid by The Mountain regarding the "Mountain Life" category of t-shirts (although sales commissions are typically classified as a general and administrative expense).  But Defendants only produced information concerning total commissions paid regarding the "Mountain Life" category as a whole, and have not shown that any commissions were paid regarding the allegedly infringing t-shirts, which form a subset, not the whole, of the "Mountain Life" category.

To arrive at his determination of Defendants' net profits, Mr. Maloney subtracted (from his gross profit calculations) his calculations regarding the overhead, general, and administrative expenses relating to the "Mountain Life" line.  He did not separately calculate Defendants' revenues, gross profits, or net profits for the allegedly infringing t-shirts.  Instead, he determined The Mountain's revenues, gross profits, and net profits for all of 2009 (rather than just the relevant period from May 31 to December 31, 2009), 2010, and 2011 from its sales of all "Mountain Life" t-shirts.  He then allocated such numbers to the allegedly infringing t-shirts on a proportional basis.  Additionally, he does not address any sales of the allegedly infringing t-shirts by Mountain Retail and the gross and net profits earned by Defendants from Mountain

Retail's sales of the allegedly infringing t-shirts.[6, 7]

A review of Mr. Maloney's deposition testimony confirms the following findings:[8]

- Defendants cannot meet the burden of showing specifically what general and administrative costs were actually increased as a result of the production and sale of the allegedly infringing t-shirts.

- Mr. Maloney could not identify a single dollar of general and administrative expenses that they would not have incurred had they not produced the t-shirts.

- In determining Defendants' revenues earned from the sales of the allegedly infringing t-shirts, Mr. Maloney did not perform any independent investigation or analysis to confirm the number of t-shirts sold by either Defendant, or the revenues earned from such sales, but relied solely upon summaries provided by Defendants.

- In determining the direct costs incurred by Defendants in connection with their production and sale of the allegedly infringing products (such as the cost of blank t-shirts and inks), Mr. Maloney did not perform any independent investigation or analysis concerning the nature or amount of such direct costs, but relied solely upon summaries provided to him by Defendants.

---

[6] When the 2009 figures are adjusted to cover only the relevant period, Mr. Maloney's figures equate to profitability of approximately $0.86 per allegedly infringing t-shirt. *See also* n. 5, *supra*.

[7] Even if Defendants' financial record-keeping were sufficient to allow Mr. Maloney to try to specifically allocate overhead expenses to the allegedly infringing t-shirts and show that such expenses actually increased as a result of Defendants' production and sale of the allegedly infringing t-shirts, the numbers set forth in his report demonstrate that such an exercise would be futile. According to Maloney's report, sales of the allegedly infringing t-shirts represent approximately 3.5% of The Mountain's total revenues for the years 2009-2011, and the number of allegedly infringing t-shirts sold by Defendants during this same period represent approximately 2% of all t-shirts sold by The Mountain. It is implausible for Defendants to argue that their overhead expenses would have been significantly less if they had not produced and sold the allegedly infringing t-shirts, which represent a comparatively insignificant portion of their total business. Given that he can not specifically allocate any of the Defendants' overhead to the infringing t-shirts, and that any such allocation would be unsupportable, Mr. Maloney simply allocates such expenses based on a percentage of sales basis.

[8] Plaintiff's instant motion was filed on July 2, 2012. Mr. Maloney was deposed on June 28, 2012, but as of the filing of the instant motion, Plaintiff had not received a transcript of the deposition testimony. As observed and reviewed elsewhere herein, Mr. Maloney has generated a supplemental expert report, which Defendants served on Plaintiff on November 6, 2012. The case has been continued and the pretrial order has been modified a number of times, with trial presently scheduled for April 15-19, 2013.

- In allocating direct costs to the allegedly infringing t-shirts, he relied solely upon allocations of direct costs calculated by Defendants.

- In determining the general and administrative expenses incurred by Defendants regarding the production and sales of the t-shirts, Mr. Maloney simply allocated a percentage of the total general and administrative expenses incurred by Defendants in each year to the allegedly infringing products on a percentage of sales basis derived from the sale of all t-shirts in the "Mountain Life" category of t-shirts, of which the allegedly infringing t-shirts were a small subset.

- In determining the appropriate amount of commissions to be deducted, he was provided with no evidence or documents confirming that any commissions were actually paid by Defendants regarding sales of the allegedly infringing t-shirts; rather, he relied upon a total number provided to him by Defendants, which was purported to represent commissions paid on sales of all t-shirts within the same line, and he applied this number proportionally to the allegedly infringing t-shirts on the unconfirmed assumption that commissions were in fact paid for each sale of an allegedly infringing t-shirt.

Mr. Maloney testified that he has never previously served as an expert in a copyright infringement or intellectual property infringement case, and that, in determining Defendants' profits from the production and sale of the allegedly infringing t-shirts, he did not perform any research to determine how such profits should be determined in a copyright infringement case. He further stated the following:

- When determining the total number of allegedly infringing t-shirts sold by Defendants, and the revenues earned from such sales, he relied upon spreadsheets provided to him by Defendants.  He undertook no further steps to verify the accuracy of such information, such as a review of a random selection of underlying invoices.  He testified that he "had some comfort level" with the figures because of financial statements provided by Defendants' outside accountants, although he acknowledged that those financial statements provided no specific revenue information regarding the allegedly infringing t-shirts.

- To determine revenues and profits for 2011, Mr. Maloney relied upon an internal financial statement provided to him by Defendants because the financial statements reviewed by Defendants' outside accountants were not

available.   He took no steps to verify the information contained in the statement.

•      To determine Defendants' profits from sales of the allegedly infringing products, Mr. Maloney asked Ms. Burke to allocate between the various lines of t-shirts sold by Defendants the total amount of costs of goods sold, *i.e.*, direct costs, as shown on Defendants' financial statements.  Ms. Burke provided Mr. Maloney with a spreadsheet that allocated these costs among t-shirt lines.  However, there were over a million dollars in expenses for each year that could not be specifically allocated by Ms. Burke, so Mr. Maloney simply allocated these expenses to each line of t-shirts based on the percentage of total revenues represented by sales of each line of t-shirts.

•      Mr. Maloney relied solely upon the amount and allocation of direct costs that Ms. Burke prepared, and he attached her document as an exhibit to his report and used it to determine the gross profits generated in 2009, 2010, and 2011 for each line of t-shirts sold by Defendants.  When Ms. Burke was preparing her cost allocations among t-shirt lines, as set forth in the exhibit, Mr. Maloney asked Ms. Burke to work from the gross profit number shown on Defendants' internal financial statements, and to make her allocations consistent with those numbers.

•      When Mr. Maloney prepared his report, he had not seen any documents from Ms. Burke in support of her calculations.  Prior to his deposition, he had recently received from her some documents and a narrative that explained her calculations, and he discussed these documents with her for about 30 minutes.  However, he had not verified whether the documents supported the figures and calculations set forth in the exhibit attached to his expert report.  He attached the exhibit to his expert report without having seen any information or documentation in support of the calculations, and he performed no other analysis to verify the information.

•      Regarding his allocation of general and administrative expenses among t-shirt lines, Mr. Maloney stated with the total general and administrative expenses incurred each year as shown on Defendants' financial statements.  He then removed commissions and royalties, together with certain expenses that he did not believe applied to the line of t-shirts Defendants sold to Wal-Mart.  He then allocated the remaining general and administrative expenses among each line of t-shirt based on the percentage of revenues represented by sales of each t-shirt line to total revenues.  He did not consider an allocation of general and administrative expenses on any other basis, rejecting an allocation based on unit sales per t-shirt line (as opposed to revenues) because he thought it would push a disproportionate amount of expense to the Wal-Mart line of t-shirts.

-9-

- Mr. Maloney was not able to specifically identify whether the majority of general and administrative expenses were allocable to a particular t-shirt line, so his method was to adopt an average based on the percentage of revenues represented by each line.  He could point to no accounting publication or standards, or case law, to support this approach.  He defended his allocation of expenses on the ground that it fairly reflected Defendants' profitability across all t-shirt lines and the it was "just not worth it" for Defendants to track individual general and administrative expenses for each line of t-shirt, although he acknowledged that, theoretically, it could be done.  He acknowledged that Defendants could not meet their burden of showing specifically what general and administrative expenses were actually increased as a result of the production and sale of the allegedly infringing t-shirts, answering "No" to the following question: "But if they hadn't been produced by The Mountain, but for their actions, if they hadn't produced these disputed shirts, you can't point specifically to one dollar of general and administrative expenses that wouldn't have been incurred in any event, can you?"

- Regarding the deduction of commissions, Mr. Maloney relied upon a document, provided to him by Ms. Burke, summarizing total commissions paid by The Mountain with respect to the entire line of t-shirts, of which the allegedly infringing t-shirts are a subset, and he allocated commissions equally to each line of t-shirt.  He based this calculation on the assumption that Defendants had paid a commission for each allegedly infringing t-shirt, although he had seen no documents verifying that any commissions had actually been paid for any allegedly infringing t-shirt, and he had received no confirmation of this assumption.

- Mr. Maloney's calculations include no revenues from Internet sales of the allegedly infringing t-shirts by Mountain Retail.  Although documents produced by Defendants indicate sales of allegedly infringing t-shirts by Mountain Retail, Mr. Maloney allocated all of Mountain Retail's revenues to other t-shirt lines, and he undertook no analysis to determine how many allegedly infringing t-shirts had been sold by Mountain Retail, and what profits had been generated by such sales.

As previously noted, Mr. Maloney later generated a supplemental expert report, which Defendants served on Plaintiff on November 6, 2012.  In his supplemental report, he continues to adopt the same positions, methodologies, and allocations that he posed in his initial expert report and to which he attested in deposition.  His calculations of the revenues and the net profits earned by Defendants from their sale of allegedly infringing t-shirts in 2009, 2010, and 2011

remains unchanged from his initial expert report.  For 2012, he uses the revenue figure generated by Defendants for sales of allegedly infringing t-shirts and, to determine Defendants' profits from these 2012 sales, he multiplies this revenue number by 9.03%, which represents his calculation of Defendants' net profits in 2011 for the entire line of t-shirts of which the allegedly infringing products are a subset, and extrapolates an annual profit figure through December 31, 2012, using the 2011 number.

Mr. Maloney's supplemental report clarifies that his report covers only sales of allegedly infringing t-shirts by The Mountain, and that representatives of The Mountain will separately address the profitability of such sales by Mountain Retail.

**3.**

Plaintiff contends that, aside from irregular and discontinuous summary documents, which purportedly support the calculations performed by Ms. Burke, Defendants have not provided any evidence to support their calculations of direct or indirect costs.  According to Plaintiff, underlying information and data to support these reports, such as invoices, was not produced, and Defendants have not produced any information documenting that they have incurred the direct costs of goods sold, the indirect costs, or the overhead expenses and commissions that Mr. Maloney allocated to the allegedly infringing t-shirts.

According to Ms. Burke, all t-shirt orders, together with the charges and costs underlying those orders, are reflected by invoices.  The Mountain keeps and maintains copies of these invoices, which show the orders and price charged per shirt, royalty data, the purchaser of the shirt, discounts, shipping costs, additional charges for printing, and other data that would enable a more-accurate calculation of Defendants' direct and indirect costs incurred by the production, distribution, and sale of the allegedly infringing t-shirts.  Ms. Burke acknowledged that, to

determine the accuracy of the financial reports upon which she and Mr. Maloney relied, she would need to examine the "detail" within the invoices.

Plaintiff states that it asked Defendants, in discovery, to produce all documents reflecting the total number of t-shirts Defendants sold, all documents reflecting total revenues for those t-shirts, and all documents reflecting the profits from those t-shirts.  Orders and price charged per shirt, royalty data, discounts, and shipping and printing costs, as reflected by Defendants' invoices, fall squarely within those requests.  Yet, according to Plaintiff, Defendants have produced none of this information.  Plaintiff adds that it asked Defendants to describe their methodology used in calculating profits, identifying each item of cost and expense deducted from the amount of revenues, but that, instead of responding to the interrogatory, Defendants pointed to the financial reports that allocate costs as a percentage of the business's expense, and not to documents showing actual costs incurred.

## III.

### A.

A copyright infringer "is liable for . . . the copyright owner's actual damages and any additional profits of the infringer . . . ."  17 U.S.C. § 504(a)(1).  "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).

Section "504 creates an initial presumption that the infringer's 'profits . . . attributable to the infringement' are equal to the infringer's gross revenue."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 529 (4th Cir. 2003) (quoting *Konor Enters., Inc. v. Eagle*

-12-

*Publ'ns, Inc.*, 878 F.2d 138, 140 (4th Cir. 1989) ("Under 17 U.S.C. § 504(b), a copyright owner is entitled to recover 'any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages.")).   In other words, "under § 504(b), all gross revenue is presumed to be profit 'attributable to the infringement' unless the infringer is able to demonstrate otherwise."   *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 n. 9 (4th Cir. 2002).

"If the infringer wishes to establish that its operating expenses are deductible expenses, it has the 'burden of proving that each item of general expense contributed to the production of the infringing items, and of further offering a fair and acceptable formula for allocating a given portion of overhead to the particular infringing items in issue.'" *Thomas M. Gilbert Architects, P.C. v. Accent Builders and Developers, LLC*, 377 Fed. Appx. 303, 310 (4th Cir. 2010) (quoting *In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 565-66 (2nd Cir. 1994)); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.03[B] (1993).   A defendant cannot rely on general categories, such as "general and administrative costs," without also showing what specific costs are actually included in those categories and how those costs actually contributed to the infringing products.   *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985).[9]   "It is too much to ask a plaintiff who has proved infringement also to do

---

[9] Citing *Kamar International, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1331 (9th Cir. 1984), the United States Court of Appeals for the Ninth Circuit observed as follows in *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985):

> We do not doubt that some of defendants' claimed overhead contributed to the production of *Hallelujah Hollywood*.   The difficulty we have, however, is that defendants offered no evidence of what costs were included in general categories such as "general and administrative expenses," nor did they offer any evidence concerning how these costs contributed to the production of *Hallelujah Hollywood*.   The defendants contend their burden was met when they introduced evidence of their total overhead costs allocated on a

(continued...)

the defendant's cost accounting," *Taylor v. Meirick*, 712 F.2d 1112, 1121-22 (7th Cir. 1983), and the United States Court of Appeals for the Fourth Circuit has rejected the "argument that the district court should have assumed the burden of allocation itself. Section 504 is clear that the burden of proving deductible expenses lies with defendants," *Thomas M. Gilbert Architects, P.C.*, 377 Fed. Appx. at 310.

In sum, "a deduction for overhead is only permitted when 'the infringer can demonstrate it was of actual assistance in the production, distribution, or sale of the infringing product.'" *Alexander v. Chesapeake, Potomac & Tidewater Books, Inc.*, 60 F. Supp. 2d 544, 550 (E.D. Va. 1998) (quoting *Kamar International, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1331 (9th Cir. 1984); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, Civil Action No. 8:06-cv-02662, 2011 WL 4596043, at *6-7 (D. Md. Sept. 30, 2011).[10]

---

[9](...continued)

> reasonable basis. The district court apparently agreed with this approach. That is not the law of this circuit. Under *Kamar International*, a defendant additionally must show that the categories of overhead actually contributed to sales of the infringing work. 752 F.2d at 1332. We can find no such showing in the record before us. Therefore, we conclude the district court's finding that "defendants have established that these items of general expense [the general categories of claimed overhead] contributed to the production of 'Hallelujah Hollywood'" was clearly erroneous.

[10] In *Victor Stanley, Inc. v. Creative Pipe, Inc.*, Civil Action No. 8:06-cv-02662, 2011 WL 4596043, at *6 (D. Md. Sept. 30, 2011), the district court rejected the defendants' suggestion of "an allocation of overhead to revenues derived from [Victor Stanley, Inc. ("VSI")]-like products based upon the proportion of sales of such products to sales of all products," observing that the court would

> allow a deduction for overhead only to the extent that Defendants would establish that the overhead was increased by virtue of the sales of VSI-like products. That is, that there was an excess of overhead borne over what the overhead would have been without the sales of VSI-like products. *See Alexander v. Chesapeake, Potomac, & Tidewater Books, Inc.*, 60 F. Supp. 2d 544, 550 (E.D. Va. 1999) (finding that before a defendant may deduct overhead, he has the burden of proving that the expense contributed to the production of the infringing items).

Accordingly, the court found that the defendants had "not proven entitlement to any deduction with regard
(continued...)

*B.*

**1.**

As previously reviewed, Defendants have failed to disclose information necessary to accurately calculate either direct or indirect costs related to the production and sale of the allegedly infringing t-shirts.  Defendants have failed, for example, to produce any invoices showing sales of allegedly infringing t-shirts, any invoices showing commissions paid to sales representatives regarding allegedly infringing t-shirts, or any invoices showing the purchase of t-shirts or inks used to produce the allegedly infringing products.[11]  Defendants have failed to show their direct costs.  As Ms. Burke acknowledged, the best and most reliable proof of these costs is shown on the sales invoices.  Without producing sales or other invoices, or any other information or data supporting their asserted costs, Defendants propose to ask the jury to rely on information that Defendants themselves admit they cannot confirm without examining more "detail."

In other words, without providing the jury – or, for that matter, Plaintiff – with reliable and accurate information that could be used to determine profits, Defendants would nonetheless ask the jury to speculate about the profits earned from the allegedly infringing t-shirts.  Defendants have not met their burden of producing sufficient evidence of their direct costs, and to the extent the deficient evidence is based upon and asks for speculation, it must be excluded.

---

[10](...continued)
to overhead."  *Victor Stanley, Inc.*, 2011 WL 4596043, at *7.

[11] Regarding Plaintiff's tort and contract claims, Defendants likewise bear the burden of proving their costs, and under Virginia law, a party's case can rise no higher than its own evidence.  *Zoby v. Am. Fidelity Co.*, 137 F. Supp. 38, 40 (E.D. Va. 1955) (citing *Massie v. Firmstone*, 134 Va. 450, 461-62 (1922)); *Powers v. Wal-Mart Stores, Inc.*, Civil Action No. 2:05-cv-00070, 2006 WL 2868320, at *4, *6 (W.D. Va. Oct. 5, 2006) (citing *Massie*).

At trial, Defendants will be permitted to adduce, if possible, properly admissible evidence based on the limited documents Defendants have provided, but Mr. Maloney is excluded from testifying regarding such matters.   As I have observed, Mr. Maloney relied solely upon information provided to him by Ms. Burke, and his report is devoid of any analysis concerning the determination of direct costs and the amounts thereof.   It would be inappropriate to permit Mr. Maloney to opine that Defendants' direct costs are reasonable when he has made no such determination on his own, but has simply relied upon and re-published information provided to him in summary format by Defendants.[12]   An expert cannot simply parrot his client's findings or calculations and then pass that data off as his own expert opinion.   "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.   A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[13]   *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

---

[12] Mr. Maloney's opinions regarding Defendants' profits are speculative and unreliable.   Expert testimony is admissible only if it "is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case."   Fed. R. Evid. 702.   This rule "aims to prevent expert speculation."   *Bryte v. Am. Household, Inc.*, 429 F.3d 469, 477 (4th Cir. 2005).   Instead of undertaking an independent analysis of Defendants' direct costs of goods sold in connection with the production and sale of the t-shirts, Mr. Maloney simply relied upon the allocations provided to him in summary format by Ms. Burke.   This does not constitute an expert opinion.

Regarding the costs that Ms. Burke could not allocate, Mr. Maloney simply allocated a percentage of all costs incurred by Defendants to the allegedly infringing t-shirts.   Defendants, however, are required to show that any expense they seek to deduct, including overhead, actually contributed to the production, distribution, or sales of the t-shirts.   *Alexander*, 60 F. Supp. 2d at 550.   Allocating a percentage of these costs to every shirt, without making the requisite threshold inquiry, renders Mr. Maloney's opinions unreliable and unsupported.   *See, e.g., Star Broadcasting Inc. v. Reed Smith Ltd. Liability Partnership*, Civil Action No. 1:08-cv-00616, 2009 WL 482833, at *8-10 (E.D. Va. Feb. 24, 2009).   In sum, Mr. Maloney's opinion is simply an unsupported estimate of how certain of Defendants costs could be allocated to the allegedly infringing t-shirts.

[13] The term *ipse dixit* represents "the bare assertion fallacy," and it "has been used in modern legal and administrative decisions, generally as a criticism of arguments based solely upon the authority of a given organization."   *See* http://en.wikipedia.org/wiki/Ipse_dixit (last accessed March 28, 2013).

-16-

509 U.S. 579 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) (citing *Joiner*, 522 U.S. at 146).

**2.**

Defendants have failed to adduce any information or data to support their assertions of commissions paid regarding the allegedly infringing t-shirts, or their alleged related overhead expenses.  Having failed to provide this information in discovery, Defendants cannot claim at trial that they should be entitled to deduct unsupported claims for commissions and overhead expenses.  Instead of undertaking the incremental cost analysis necessary to determine whether Defendants' claimed costs and expenses were actually increased by the production and sale of the allegedly infringing t-shirts, Defendants have simply applied an across-the-board average encompassing their entire business, and not just expenses that actually assisted in the production, distribution, and sale of the allegedly infringing t-shirts.  Persuasive authority from within this circuit compels me to find that such evidence is insufficient to allow a jury to derive profits from this scheme.

In *Victor Stanley, Inc.*, *supra*, 2011 WL 4596043, for example, the district court rejected the defendant's attempts to deduct operating expenses that included employee expenses (salaries, health insurance, workmen's compensation) and overhead (rent) because the defendant failed to show the extent to which its employees provided "substantial services directly related" to sales of the infringing products, or evidence that the claimed employee expenses "would have been any less" without the sale of the infringing products.  *Id*. at *6.  The court also rejected the defendant's suggestion to allocate overhead to the infringing products "based upon the proportion of sales of such products to sales of all products," as the defendant bore the burden of showing that there was an actual "excess of overhead borne over what the overhead would have

been without the sales of" the infringing products.  *Id.* (citing *Alexander*, *supra*, 60 F. Supp. 2d at 550).  Yet, this is the approach Defendants seek to take in the instant case.

Likewise, in *Alexander*, *supra*, 60 F. Supp. 2d 544, the district court rejected the defendant's attempt to deduct overhead expenses where the defendant had failed to prove that those expenses were "of actual assistance in the production, distribution, or sale of the infringing product."  *Id.* at 550 (citing *Kamar*, *supra*, 752 F.2d at 1332).  Although the defendant presented evidence that overhead averaged $1.15 per book, the court held that, "before a defendant may deduct overhead, he has the burden of 'proving that each item of general expense contributed to the production of the infringing items in issue.'"  *Id.* (quoting *In Design*, *supra*, 13 F.3d at 565-66).  The defendant could not deduct overhead where it had failed to present evidence that specifically attributed those expenses to the infringing products.

The same reasoning prevailed in *Thomas M. Gilbert Architects*, *supra*, 377 Fed. Appx. 303.  There, "following GAAP," *i.e.*, "generally accepted accounting principles," the defendant deducted the entirety of its operating expenses from its revenues of the two infringing products, including expenses that had "no relation to defendants' infringing acts."  *Id.* at 310. The Fourth Circuit observed that "GAAP, however, is not the law here.  There are likely many good reasons why the GAAP rules are as they are, but those reasons do not necessarily coincide with the reasons bearing on assessing damages for copyright violations."  *Id.*  The Fourth Circuit held that, "[b]ecause *each* item of deductible expense *must* contribute to the infringing products, at least some of defendants' operating expenses as calculated cannot be deducted from gross revenues," and the Court of Appeals agreed "with the district court that defendants simply failed to carry their burden of allocating that portion of their operating expenses attributable to the two units that were sold."  *Id.* (emphasis added).

Here, too, The Mountain and Mountain Retail cannot carry their burden of showing that the "general and administrative expenses" they seek to deduct from revenues actually assisted in the production, distribution, or sale of the allegedly infringing t-shirts.  Although Ms. Burke stated that it is "tough" for Defendants to determine net profits from revenues, this perceived difficulty does not lower the standard.  *See*, *e.g.*, *JTH Tax, Inc. v. H&R Block Eastern Tax Servs., Inc.*, 245 F. Supp. 2d 749, 752-53 (E. D. Va. 2002) (that the defendant found it "impossible" to show that deductible expenses were attributable "solely" to infringing products did not relieve its burden of proof).

Mr. Maloney's approach for determining a purported average cost is not sufficient to carry the burden.  *See*, *e.g.*, *Alexander*, 60 F. Supp. 2d at 565-66.  The only expenses Defendants are entitled to deduct from revenues of the allegedly infringing t-shirts are those that they can show were actually increased by the production or sale of the t-shirts.

By their own admissions, Defendants cannot show that any of their claimed overhead expenses were actually increased by their production and sale of the allegedly infringing t-shirts, and they have not demonstrated that they actually paid any commissions regarding sales of the t-shirts.  Defendants' attempts to allocate overhead expenses and commissions based on their assertion that these expenses are born equally among all t-shirts on a percentage of sales basis is insufficient.  As Defendants have not at this point met their burden, the presumption holds that their revenues from the allegedly infringing t-shirts equates to profits.

*C.*

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence."  Fed. R. Civ. P. 37(c)(1).  "Rule 37(c)(1) does not require a finding of bad faith or callous disregard of the

discovery rules." *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003).

Here, the record reflects that Defendants failed to produce information responsive to Plaintiff's discovery requests, and which is necessary for an accurate calculation of profitability. Following Ms. Burke's deposition, Defendants had to have been aware that they were in possession of information, including invoices and sales commissions reports, that are relevant to and necessary for an accurate calculation of their profits from the sales of the allegedly infringing t-shirts. Apparently, Defendants chose not to produce the information, despite that fact that it was discoverable and within the scope of Plaintiff's discovery requests. Having failed to produce the underlying information and data in the discovery process, Defendants are now precluded from introducing additional heretofore undisclosed evidence concerning their profits.

As the non-disclosing party, Defendants carry the burden to show that their failure to provide the information requested in discovery was justified or harmless. *Southern States*, 318 F.3d at 596 (citing *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001)). But the preceding pages of this opinion show that Defendant cannot meet that burden. The failure to disclose evidence concerning profits has not been justified. That Defendants may not have been able to produce that information in a convenient manner does not relieve them of their responsibility to comply with the rules of discovery, and to produce the information necessary to support their own proof of profitability and for Plaintiff to perform its own calculation of recoverable damages. *See, e.g.*, *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 607 (6th Cir. 1991) (plaintiff's efforts to ascertain defendant's profits were frustrated by defendant's insistence that its profits could not be readily determined; court held that "common sense" dictated that the burden of apportioning profits be placed on defendant).

Defendant's failure to disclose the requested information is not harmless, either.  Plaintiff must simply accept the amounts of Defendants' claimed revenues, direct costs, indirect costs, and commissions without having been provided the information that Defendants' own financial designee, Ms. Burke, admitted is required to accurately determine Defendant's profitability. "'[R]ules of expert disclosure are designed to allow an opponent to examine an expert opinion for flaws and to develop counter-testimony through that party's own experts.  Such was not possible here." *Southern States*, 318 F.3d at 598 (quoting district court opinion below).  I accept Plaintiff's assertion that it has been significantly prejudiced in its ability to examine Defendants' profitability calculation and to develop counter-testimony through its own expert.

Because Defendants' failure to disclose information necessary to perform a proper calculation of its profits is neither justified nor harmless, Defendants are prohibited from introducing additional, heretofore undisclosed evidence concerning profitability.

## IV.

For the reasons and to the extent stated herein, Plaintiff's motion (docket no. 45) will be granted.  An appropriate order accompanies this memorandum opinion.

Entered this 29th day of March, 2013.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE